IN THE MATTER OF THE APPLICATION FOR PROBATE OF THE LAST WILL AND TESTAMENT OF ELIZA B. BECKETT, DECEASED.

*Will — publication of — no particular form of words is necessary.*

Upon an application for the probate of a will, it appeared that the testatrix had been greatly attached to a niece, and had always cared for and supported her. She went to visit her in Connecticut, in August, 1881, and remained there for over a month. Just before leaving New York she told her maid that she was going to leave all her property to her niece; that she was going to make a will, but she did not know when, and she asked the maid if she would sign it; she stated that the case might come into court, but that the witness need not be frightened. On October 5, 1881, when the will was executed, the maid came into the room where the testatrix and the other witness were, and the testatrix said: "There is the paper I spoke to you about signing;" and then said: "It may make you come into court, but you need not be afraid."

*Held*, that this was a sufficient publication of the will as to the maid.

The other witness had been a witness to the execution of three other wills made by the testatrix, the last of which had been duly declared by the testatrix, in the witnesses' presence, to be her last will. She was sent for at the time the will in question was executed, and was asked on her arrival by the testatrix to sign the paper, and told that the testatrix wanted to make alterations in her previous one on account of the sickness of her niece, and that she was sorry to trouble the witness again to sign the paper. The witness testified that although the testatrix did not then declare to her that the instrument she then signed was a last will, or a codicil thereto, yet from the knowledge of what had gone before she knew it to be a will.

*Held*, that there was a sufficient publication of the will as to this witness.

APPEAL from a decree of the surrogate of the county of New York, refusing to admit a will to probate.

*Charles W. Bangs* and *John L. Cadwalader*, for Alice McBlair, legatee, appellant.

*E. Ellery Anderson, Joseph S. Auerbach* and *Richard W. Stevenson*, for Isabella Walsh and others, respondents.

DANIELS, J. :

The instrument presented as the will of the deceased was written by herself. It was dated on the 5th of October, 1881, subscribed by her and by two witnesses, who were present at the time of its execution. It was written substantially in form as it has been set forth in the case, and was partially upon two sides of the same paper, the second side including all that was written after the word " in," as it has been set out in the case and the points. It was as follows :

" *Octo. 5th,* '81.

" My last will and testament. I leave and bequeath to my niece, Alice McBlair, all the money I die possessed of in several banks and bonds, besides all I bequeathed to her in my former will.

" I leave $200 to my niece Ellen Laffan, to use for a purpose I have explained to her in writing, and which she has promised to attend to faithfully.

" In case of the death of Alice, I desire all I have left to her to be divided equally between my nieces, excepting $1,000 for the

suffering poor, to the care of Father Doherty, Holy Innocents Church.

"Signed in the presence of two witnesses.

"ELIZA B. BECKETT.

"MARIE DEEN,

"104 East 54th st.

"LOUISE DE CASSINI."

And it was proved by uncontested evidence that decedent intended, prior to the time when this instrument was executed, to make a testamentary disposition of her property in favor of Alice McBlair, the principal legatee, who was her niece. The decedent had no children. Alice McBlair was the daughter of her deceased sister, who died when Alice was of about the age of two years. From that time she became a member of the family of the decendent, and continually resided with her until she was taken to Litchfield, in the State of Connecticut, and placed there in an institution for medical treatment. The intervening period was nearly, if not quite, twenty-six years, and during that time the relations between the decedent and Alice were those of mother and daughter. The intimacy and affection of that relation is shown to have existed between them, the decedent having educated Alice and guarded and cared for her with the solicitude and tenderness of a mother, and the latter fully reciprocating the ardent affection of a daughter. Nearly a year before the execution of this controverted instrument, Alice became impaired in her health, and appears from that time to have been a person of unsound mind ; and she was placed in the institution at Litchfield to receive medical attention for her disease. The decedent appears to have regarded the dependence of Alice upon her bounty as increased by this circumstance, and on that account concluded to make such a disposition of her property as surely to secure the protection of her adopted daughter during her life. Her deceased husband had previously, in his will, provided an annuity of $500 a year for this adopted daughter, and the decedent intended to enlarge the provisions made in her behalf, as far as that could be done within the limits of her own property and resources. And she was actuated with that intention in drawing and subscribing this instrument. Before doing so she proceeded to Litchfield for the purpose of being near this adopted

daughter and understanding her condition and ascertaining the probabilities of her recovery. She remained there upwards of a month after the 13th of August, 1881. Before her departure upon the journey she was during the preceding night at the Grand Union Hotel in the city of New York. She had with her there Louise De' Cassini, one of the witnesses, who was in her service, and a conversation took place between them concerning the future purpose of the decedent in the execution of a will. Her statement, as it was related by the witness, was, that "she was going to make a preparation for her daughter. I knew whom she meant. She asked me if I would be willing to sign a paper for her any time that she would ask it of me, and I told her I would. * * * She said in the hotel she was about to make a will, but she did not have me to sign that will." In her cross-examination, referring to the same conversation, the same witness stated: "She told me that she thought a great deal of her daughter, and she said all she had she was going to give to her daughter. She said her daughter was her favorite, and she thought a great deal of her, and nothing was too good for her. She told me she was a very handsome girl. She was sorry and very much grieved that she had to be where she was." At Litchfield this subject was again recurred to, when the witness was told by the decedent that "the case may come into court some day, but that I need not be afraid, that nothing would happen to me about it." She further testified: "She said to me she was about going to make a will, but she did not know when." * * * And added: "She said, 'would you be willing to sign that paper for me,' but she did not say the paper or refer to it as a will;' but she said 'would you be willing to sign a paper for me some day.'" The latter statement rendered her evidence somewhat confused as to the character of the paper referred to in the conversation; but, both in her direct and cross-examination, she stated the fact that the instrument which was to be made and witnessed was mentioned by the decedent as a will. And as that statement was in no manner withdrawn during the course of her examination, it is probable that the last answer referred to was confused in taking down the evidence, and that it should not be regarded as reducing, in any respect, the force of the preceding statements mentioned to have been made by

the decedent, that the paper she referred to was to be a will. The other part of the conversation, relating to her affection for her adopted daughter and her design in her behalf, also indicates her purpose to be, to make a testamentary disposition of her property in favor of this niece. These are circumstances to be considered with the other evidence relating to what transpired at the time when the paper was subscribed and witnessed. That it was subscribed by the decedent in the presence of the two witnesses, admits of no reasonable ground for doubt, although the other witness was not able to testify that she saw the decedent sign her name. She was present before the preceding witness De Cassini was called in, and from the order in which the witnesses subscribed their names, probably subscribed before the other witness. And she testified that she was quite sure that she saw the signature of the decedent to the paper before her own name was added to it as a witness, and that her recollection was that the decedent signed the paper before the witness De Cassini came into the room. But as to this fact she was evidently mistaken, for the witness De Cassini was clear and positive in her testimony that the decedent subscribed her name to the paper after she herself entered the room, and that it was done before she was permitted to sign it as a witness. She also thought that Deen subscribed the instrument as a witness after she herself had witnessed it. It is not important, however, to determine the accuracy or inaccuracy of this statement, for the witness Deen did state that " she must have signed it at the time I did," and that she thought she saw the signature when she herself signed as a witness. And the evidence of the other witness is that the decedent signed after she herself went into the room, and she went there while the witness Deen was there. The fact of the subscription of the instrument by the decedent, in the presence of the two witnesses, was established by this proof. These three persons were the only individuals who were present, and Cassini testified that the decedent stated that she must sign the paper first, and sat down and then subscribed it. And after both the witnesses had signed, the decedent folded it up and put it away as a completed instrument.

The important point to be determined is not as to the subscription of the paper by the decedent in the presence of the witnesses, but as to the fact of her declaring it to be her last will and testa-

ment. The statute has required that at the time of making the subscription, or at the time of acknowledging it, the person subscribing the instrument shall declare it to be a last will and testament. No formal declaration of that fact was made by the decedent in the presence of these witnesses, but when the witness Cassini entered the room then occupied by the decedent and the witness Dean, the former said: "There is the paper I spoke to you about signing. I was going to sit down, and she said wait a moment, that she had to write first. She said, are you willing to sign? I said, yes; she said, well it may make you come to court, but you need not be afraid there will be no trouble upon you for it. Miss Dean was there at that time, she stood up in the room in the middle of the floor." And that statement in its allusion to the paper was again repeated by the witness in the course of her cross-examination. But while it was not then mentioned or referred to as a will, the allusion to what she had said to the witness before about signing was sufficient to intelligently inform her that this paper was designed to be her will. She had, in the conversation near the middle of September, stated to the witness that she was about to, and intended to, make a will, and inquired of her whether she would sign it, and that the witness had promised to do. When her presence was procured on this occasion, and the testatrix remarked to her that "there is the paper I spoke to you about signing," she clearly intended to refer to the preceding conversation had between herself and this witness. And as she had mentioned in that conversation that the paper was to be a will, when she said, "there is the paper I spoke to you about signing," the statement was equivalent to saying to her "there is the will which I mentioned to you I intended to make." That would be the ordinary understanding resulting from this statement and the reference to what had been said before about signing. And it was equivalent to a declaration by the decedent that this paper had been drawn and subscribed by her as her will.

To make the declaration required by the statute no form of words are essential, but what is required is that the witnesses shall be given to understand by words or acts by the decedent that the proposed instrument is intended as a will. Upon this subject it was said in *Remsen* v. *Brinckerhoff* (26 Wend., 325, 332), by the chief justice,

"I agree that no form of words will be necessary, that the legislature only meant there should be some communication to the witnesses indicating that the testator intended to give effect to the paper as his will. Any communication of this idea or to this effect will meet the object of the statute." And that was approved in *Gilbert* v. *Knox* (52 N. Y., 125). By the conversation which took place, and the reference in it to what had before been said, the fact was indicated and brought to the knowledge of the witness that this paper, which was present and made the subject of the final conversation, was the will which the decedent had previously expressed it to be her design to make in her conversation with this witness at the Grand Union Hotel. And that complied with all that the statute has required for the observance of this ceremonial in the execution of a testamentary instrument.

The evidence of the other witness was still more explicit. She had witnessed preceding wills made by the decedent in 1876, 1877 and 1880. The will of 1880 was subscribed by this witness and still another person, and as the other, who was the decedent's maid, was turning from the table to leave the room, the decedent inquired of her if she knew what the instrument was, and when she replied that she did not the decedent said, "it is my last will and testament." That was a formal declaration as to that instrument establishing a complete compliance with this requirement of the statute. And as the witness Deen was also a witness to that instrument, and was present when this declaration was made, she clearly understood the instrument subscribed in 1880 to have been designed as the will of the decedent. She was sent for to witness the instrument now in controversy. Upon her arrival she was asked by the decedent to sign this paper, "that she wanted to make alterations in her previous one on account of Miss McBlair's sickness. That was the last one in 1881." * * * "When I came there she wanted me to sign a paper again, that she wanted to make alterations of a previous one on account of Miss McBlair's sickness." * * * "She just simply asked if I would sign that paper on account of Alice's sickness, that she wanted to alter it." She said she was sorry to trouble me again to sign the paper." This paper was lying upon the table at the time and the witness did subscribe it as has already been stated. She testified further that the dece-

dent did not declare to her, or in her presence, that this was her last will and testament, or that it was a codicil to her last will and testament. But from her knowledge of the fact that it was made to effect alterations in a preceding will, which she understood and knew to have been a testamentary instrument, and was requested to witness it for that purpose, she had good reason for believing and understanding that this last instrument also was a will, although no formal announcement of that fact was then made in her presence. The declaration of the object to be accomplished by it, and of the instrument to be affected, which she knew to be a will, were sufficient to inform her that this was such an instrument, and that she was requested to sign it to add to its formal validity. And that she did so understand it was finally stated by herself in her evidence. This statement was contained in her answers, by which she related the fact that she knew what this paper was and knew it from the manner in which the decedent spoke and the way in which she acted. Her final answer was: "She spoke of that paper as her will, and she spoke of this being alterations of the other paper, and of course I knew it was her will." To each one of these witnesses, therefore, the decedent communicated the fact, in these requests and allusions, that the paper they were requested to witness was designed by her to be her will. And that complied with all that the statute required to create a valid publication of it as such.

It is true that in and by it, the decedent did not propose to make a complete disposition of her estate, but that has not been required to render it legally effective as her will. She did, by means of it, design to dispose of a portion of her estate. The expression of that design is entirely clear, and the fact that neither the preceding will referred to by her, nor a later one she may have made, has ever been found, will not prevent this one from being carried into effect. So far as this instrument was designed to make an independent disposition of her estate, it was lawfully made and required to be carried into execution. It has been contested on behalf of her two surviving sisters and the children of her deceased brothers and sisters. The resistance to its probate was placed chiefly upon the uncertain character of the evidence tending to establish the declaration by the decedent that the instrument subscribed was her last will and

testament. The proof certainly was close and critical, but, at the same time, as it evidently was designed to and did bring the minds of these witnesses to the knowledge of the fact that the decedent intended this instrument to be her will, that was all which the law required to comply with this provision of the statute. · The policy of the disposition proposed to be made of the estate, is not a subject to be considered by the court. All that can be required is that the statutory formalities shall be proven· to have been observed, and that they were is the reasonable import of the evidence given upon the hearing before the surrogate. What the statute had directed was conformed· to. The instrument was proved in such a manner as to entitle it to be admitted to probate. This was the legal effect of the evidence produced upon the hearing. It presented no question of fact but one purely of law, and no further trial of the contest between these parties can therefore be necessary. But the decree of the surrogate should be reversed and a decree should be entered establishing the instrument proposed as the will of the decedent, and directing it to be admitted to probate, with costs to the several parties to be paid out of the estate.

Davis, P. J., and Brady, J., concurred.

Decree reversed and decree directed as stated in opinion, with costs to the several parties out of the fund.